This is the matter of David Miner v. Beverly Hastings et al. Mr. Sanders. Good morning. May it please the Court, Stephen G. Sanders, on behalf of the appellant David Miner, with me at Council Tables, Andy Collett, we're from the Gibson-Sermon-Newark. The Court, please, I'd like to reserve four minutes for rebuttal. Go ahead. We ask the Court to reverse the order denying habeas relief for two independent reasons. The first one is the Darden issue on which this Court initially granted a certificate of appealability. And that issue, as this Court knows from my brief, turns on a misstatement by the prosecutor in summation regarding the burden of proof. And in this case, there was no, absolutely no consideration by the Appellate Division, the last recent decision of the State Court about the strength of the evidence in this case, to measure the prejudicial effect of that argument. Why would that be necessary? Let's start with what happened. And what happened here was that the use of percentages was first introduced through the testimony of the victim, right? That's correct. It is next invoked by trial counsel for Mr. Miner during closing argument. So she is the one who chose to characterize the 80% figure as a low B. Correct. Why is that really not invited error? Didn't the prosecutor have to say something in response to that? Something. Well, the prosecutor has every right to respond to arguments, and let me answer that in two parts. Number one, the Appellate Division did not find that this was invited error or an unfair comment. The Appellate Division noted that this argument came following the defense argument, but there's been no finding either by the Appellate Division or even by the jury. If we're looking at this under the AEDPA standard, why wouldn't we need to consider the fact that this was in response to the defendant's closing? Well, and I'll answer both questions at the same time. It's the State Court's job to apply Darden reasonably, but in this case the defense attorney in making that argument didn't say to the jury, reasonable doubt requires 100% certainty. Well, that had been the argument. Well, except that there are no cases out there to suggest that 100% certainty is required, and for that matter there are no cases that I know of that say 80% is enough or is not enough. I think the whole introduction, frankly speaking for myself alone, of percentages to discuss reasonable doubt is very, has not only dubious value, probably no value. I assume we could agree, just the two of us agree, that the suggestion that 80% is enough for reasonable doubt is, A, a legal issue being introduced here, and that it is incorrect, and therefore what the prosecutor did was make an erroneous statement of law. Yes. All right. There's nothing to support 80%, frankly, intuitively. I doubt that's enough, but that is not a question I think that we have to resolve here. Right. There were these percentages. I mean, this was argument. Defense counsel urged X. Opposing counsel urged Y. Clear to the jury that there's an argument about whether these percentages apply, and then the judge gives a very good instruction about what reasonable doubt is and says arguments of the lawyers are not evidence. So it's hard to imagine that in and of itself that the judge's instruction, it's not something that the jury, you know, plunked it. Well, Judge Randell, as we note in our brief, the jury I don't think would have known that what the parties were arguing were inconsistent with the judge's instruction and in a case where the judge made no mention of percentages whatsoever. He says you decide for yourself based on X. Right. Percentages off the table. The judge did instruct the jury on reasonable doubt, but in this case with the evidence being as weak as it was, right, and so Darden is a sliding scale, right? But in the end it wasn't just 80%, was it? I mean, you had the two separate identifications. Correct. So in the end the government's case is actually factually stronger than the 80% would suggest. And that's the other answer to your question. That's what the prosecutor should have gone to, which he ultimately did, which is, well, the defense wants you to focus on this 80% at the time of trial, but doesn't that show that the victim is being credible because earlier in time he makes a stronger identification? But weren't both counsel in their arguments legally incorrect? Because the question was not whether 80% or 95% is enough for reasonable doubt. 80% and or 95% were the figures being placed upon the certainty of the witness himself, which is a factual matter, not a legal question. So what counsel both in their respective ways managed to do was transform what is inherently a factual question into a misstatement of law. They did do that. Both of them did. Well, I don't know that what the defense said is a misstatement of the law. The defense, maybe inartfully, was trying to say this is unreliable evidence, that's reasonable doubt. Well, the inartfulness makes it made in a misstatement of law, really. Well, I'd like to get to the Batson issue as well. Good. Because in reviewing this for today and preparing, I became even more troubled as I looked through jury selection. Is there anything in the record about the ultimate racial composition of the veneer? Of the veneer? No. And I certainly wish that would be in the record, and I certainly wish I was here. So you can't calculate challenge rate here? You can't calculate challenge rate, and I wish I were here on an effectiveness claim as well because a good defense attorney would continue to keep re-raising the Batson claim as jury selection progresses. That's a huge problem here, isn't it? And might have, and obviously would have said more than just four out of five, would have said, well, this woman said this, and that would mean that she'd probably be more favorable to the government than not, so these make no sense, et cetera, et cetera, et cetera. Right. And then probably a prima facie case would have been satisfied. Well, but in a case based on numbers alone, it's obviously better to have the strike rate, the exclusion rate. But that's what we're left with, isn't it? I mean, isn't this numbers alone, at least as far as the prima facie cases? No, it's not, Your Honor. It's numbers plus the statement that we quoted in our brief. Was there an objection to that statement? There wasn't an objection to it, but because the trial court – It's after the fact. It's after the fact. But the trial court applied the wrong standard when it found no prima facie case. So the appellate division – Why? What standard did it apply? It applied the pre-Johnson standard of substantial likelihood. So the appellate division purported to correct that error. But when the appellate division did that, it didn't just look at the state of the record at that time. It considered, as it was entitled to do, everything in jury selection. I mean, if the prosecutor had made an outright, blatant, racist statement, even, let's say, in summation, I think that would be fertile ground up on direct appeal for the defense attorney to point to that. So I'm looking at that statement now, a complaint, a gratuitous complaint that the jury is comprised of too many African-Americans. Now, wait a minute. That is not the language. That is not the language. I read this entire Vargier transcript, and there are a lot of things that struck me from that reading, both the sloppiness of both of counsel to the sloppiness of the state trial judge at the initial challenge of the four out of five when the prosecutor should have been put to her proof as to why she had taken those strikes. That wasn't done at all. But I certainly didn't. And what then comes through loud and clear to me anyway is that you had a tit-for-tat between these two counsel. First, there was the Batson challenge by the defense counsel, and then there was a palpably angry Batson challenge made farther down the line by the prosecutor. That's correct. And if the defense attorney was engaged in reverse Batson discrimination, that's outrageous. It's not really relevant. It's not relevant, and it shouldn't inure to my client's detriment. But here's the important point. If I can convince the court that the appellate division really applied what was a step three test instead of test one, step one, then we satisfy 2254-D1, and you're allowed to review this de novo. And so the question— Well, what do you—assuming that you're right in that— excuse me— when I looked at the five witnesses for whom perimetries were used during the first day, I mean, any prosecutor worth his or her assault, and we've all been in situations where we see the transcript in the court itself, these incredibly contrived examples come up for justifying striking a black juror. Right. Any lawyer worth his or her assault can justify it. Could you have had a situation where, on the face of it, there are very valid reasons for striking each of these five folks, four of whom were black? Well, but we don't know if that was the prosecution's actual reasons. And until you call her, right— No, but we do know that the judge, after hearing numbers alone as the argument, and after hearing what each of these potential jurors said, said to himself, I do not find an inference of discrimination from numbers alone. Now, to me, that says, because I was a trial judge, I listened to this, and I can see why a prosecutor would strike this person, so the numbers alone just aren't going to do it here. Now, had these people been, you know, wonderful as apple pie for the prosecution, you know, the judge might have said, mm, doesn't cut it. But he observed, and that's why I think that the standard is, you know, I think it's a clear error. It's not de novo. Well, but it's not clear, Your Honor, because there was no finding made. There's no step three finding. If there's a step three finding of no intent— Well, there's no explicit step three finding. You know, truly, I don't know what to make of this analytically, because it was so inadequately handled at the start, both by the trial court and by the prosecutor. But, I mean, how do you submit we ought to be looking at this? Should we be looking to this as purely a step one prima facie case issue, in which instance I ask what authority supports our determination that that four out of five is enough for a prima facie case, especially where it is here there was not a later objection or any kind of continuing objection? Well, again, I—so it is a step one case only, because the appellate division purported to reach— All right, so that gets resolved as a question of law, right? That's what we contend. We don't have to get to step two where factual determinations are being made by a trial judge. Right. And inherently credibility determinations. Right. We're hoping that's what will happen on rematch, because that steps two and three will be completed. So what is the authority that allows us to say there's been a prima facie case made here? Johnston, right, which reversed the California Supreme Court and said there is a prima facie case here and sent it back is number one. Number two, I cited the Osorio case in my brief, which is a state case, but that's a case out of the same office tried at the same time in 2002 in which the first six strikes were exercised. Let's say we determined there was a prima facie case. Then the next step is to get to step two. Why isn't it enough, slim, slim as it is, why isn't it enough for the prosecutor to say, well, I support this based on the answers that we all heard? And that's effectively what she said, right? That's what was said. She just said, I think if you look at the transcript, the record will bear out that I deny it. I think there was an explicit use of the word answers, but in any event, clearly for the proceedings to have gone on, the trial court judge had to have made that as a factual determination, a credibility determination, didn't he? Right. He had to have bought that excuse, slim as it was. Chief Judge Smith, that's correct. But once you require the prosecutor to provide reasons, then the defense attorney can look at what's going on with people who haven't been excluded or people who have been left on the jury and say- That's one of the problems with firing the gun so early in the game rather than later. How can we say as a matter of law that a trial judge who has observed the voir dire has observed the strikes and determines that numbers alone, the fact that there were four out of five, does not raise an inference of discrimination? How do we say as a matter of law that that's not permissible? How do we say that? Because- It's one thing to say that if a judge found numbers alone, that was fine. But how can we say he has to say that numbers alone satisfy Batson when he's observed and may have a view that really doesn't raise an inference of discrimination? My answer to that question is because you're not reviewing the trial judge's decision here. You're reviewing the appellate division's decision. The appellate division has already found that the trial judge employed an erroneous standard, and so there's no value to what the trial judge said because he was holding the defense attorney's feet to the fire, imposing a much higher standard than Johnson now requires. So the question is, did the appellate division do it right? And when the appellate division says, you know, at least four things that tell you it was employing a step three analysis, you know that the decision is contrary to Johnson and Strickland, and then the question is de novo, and you can look at the entire record. All right. We'll have you back on rebuttal, Mr. Sandberg. Thank you for your generosity. Mr. Duco. May it please the Court, Your Honor, Frank J. Duco from the Essex County Prosecutor's Office for appellees in this matter. I was going to begin by saying context is the most important word in the Darning claim, and Chief Judge Smith, you laid it out quite well. I don't need to do it again, but the prosecutor was required to say something. She could not leave that 80 percent identification is not enough. She couldn't just leave it hanging out there for the jury to consider. She had to give a response. She gave a fair and measured response tied to the evidence. When you look at that response in the context of her entire estimation, she doesn't just say 80 percent was enough. She says 80 percent coupled with the out-of-court identification she made five days after the robbery was enough to meet beyond reasonable doubt. Do we know in the photo array, was anybody in the mug shots first? Correct. Do we know, was he the only person in the subsequent photo array with six photos whose picture was also in the mug book that was viewed? Do we know that? I don't know that. I know the jury saw the six-person photo array and judged for themselves on that question, but I don't know if there was any overlap between those individuals and the ones in the mug books. Forgive me for a second. I have a hard time reading what the lawyer said during the selection of the jurors in disagreeing with what Mr. Sandler is characterizing. It is a characterization. It's not what the prosecutor said. He said, look, I've got no objection to a majority African-American jury, but the but's my thing, not the transcript. I would like a mixed jury. Basically he said, look, they've got too many black folks here, and I've got a lot of challenges. Judge, help me out here. No, I disagree with that. How else can you interpret this? I have no objection to a mixed jury. He's got to say that. What's he going to say? Judge, I've got too many black folks on my jury. He knows better than to say that. I have no objection to a majority African-American jury. I would like a mixed jury. Now, no matter which way you slice that, the prosecutor is saying that he is factoring race into the use of black race. He's striking whites to get a mixed jury. Well, he's striking blacks to make sure he doesn't have too many blacks on the jury. No, I think her point simply was that under state law at the time, she had used up her peremptory challenges. She could no longer exercise any peremptory challenges, and she was concerned that the defense attorney was using hers in an inappropriate way. There's a lot of ums. There's a lot of spaces. It's not the most artfully commented. Well, she says I would like a mixed jury. She's clearly concerned, as unfortunately almost any prosecutor would be, about the racial composition of the jury. That's basically what she's saying. I want a mixed jury. I've got a majority African-American jury here. Well, it can't be ignored in the case to say that it can't be considered is the fact that the victim was African-American as well in this case, so it doesn't really make a whole lot of sense why a prosecutor would want to exclude. I really don't want to get one on that one. I'm not going to answer that question. Get one on that. And as was pointed out before, it's very difficult. There are cases where on numbers alone a prima facie case can be found, but those numbers are usually much higher. The first four out of five of 12 strikes doesn't say a lot. All right, so isn't that your strongest argument, or isn't that at least the argument you advance first and say, no, there's nothing to support this, the inquiry ends there? Correct. All there are are the numbers, and the numbers are meaningless in this case, honestly, because we don't know what the veneer is, and if you practice in Essex County, it's probably safe to bet those were not the only four African-Americans in that veneer. Now, the record doesn't bear that out, but common sense. We don't know from the record. We don't know that. That's fair. Do we know, as a matter of fact, from the record, that a majority of the composition of the seated jury were African-American? All we know on that question is that the conclusion of the third Batson challenge in this case, the prosecutor says at that time the majority were, but there were, I believe, a few more strikes. So it's not clear from the record. How many strikes are there in Jersey? Twelve? The prosecutor gets 12, the defendant gets 20 in a non-homicide. The appellate division's conclusion that the ultimate composition of the jury made everything okay, is that really what they should be looking at? Not at step one, no. And if you look at the appellate division. So isn't that a problem that they actually deferred to the trial judge? Which they said, you know, on the issue of the prima facie case. But could they really revisit the issue under a different standard when the trial judge had used a higher standard? Is that really something that the appellate division could defer to the trial judge on its finding, but acknowledging that there was too high a standard? Well, the appellate division would defer to the finding and then determine whether, as a matter of law, it reached the Jonathan standard. Yeah, it's just kind of strange that when the trial judge said it didn't meet this high bar, then the appellate division said, well, the bar is actually lower, but we'll defer to his finding that it didn't meet the high bar. Correct, and if it was a close case, like it was in Johnson, maybe the appellate division would have did what the Supreme Court did there and found the prima facie case, but this was not a close case. Well, the appellate division said there was no proof by the defense of an unfair or unreasonable under-representation of African-Americans or women, but that wasn't the issue. There was no proof by the defense of a basis on which the prosecution should not have been striking these people. Correct. I mean, Johnson lowers the burden, but it's still a burden. The defendant was still required to come forward with several reasons. This is an inference versus substantial likelihood. It's really very different. It is different. Inference is kind of your antenna up. Substantial likelihood that it was discriminatorious. And that same may be a good example of the difference. To me, that creates an inference. It doesn't raise the level of substantial likelihood of that being the... And the appellate division said this deference is in large part attributable to the fact the trial judge is able to make firsthand observations of the demeanor of the attorney exercising the challenge and the juror in question, bearing in mind... Well, the first part of that is right. The second part obviously isn't. But the first part is right because the prosecutor said the juror's answers to the questions would show that there were non-race-based reasons. That gets us into step two, right? Isn't it? I mean, that's step two, right? I mean, so that would be my follow-up inquiry to you, assuming that a prima facie case has been shown by the defense. In moving to step two, the exact words of the prosecutor were, it's clear from the answers that the jurors gave that are African-American that I have excluded form the basis of my decision and not because they are simply African-American. Sparse, I grant you, sparse. But are you suggesting that that would still, at step two, be enough upon which a trial judge conducting voir dire can make a credibility determination, a factual determination, that these were in fact the reasons for taking these strikes? Of course. And I do acknowledge Mr. Sanders' concern that while the defense attorney then didn't have an opportunity to rebut, the record makes clear that, and even you pointed out, Judge McKee, the reasons why those jurors were struck are fairly obvious and should be fairly obvious to this court. And you can look at that record and make that determination. So if we do get there, and back to Judge Randell's point that the appellate division may have applied the wrong standard, that doesn't change the fact that there was still no prima facie case here. So even if this court looks at that question anew, there's still only the four out of five without knowing the veneer and nothing else, and that does not meet the prima facie standard. Unless the court has any other questions, I'm finished. Thank you. No, thank you, Mr. Sanders. We'll be back in a moment. Thank you. Let me pick up right where my adversary left off, and that is that the state has never argued that the trial court reached Step 2 and then made a finding at Step 3, and that's what the appellate division was doing when they issued this sort of hybrid decision. You haven't made a prima facie case because you haven't proved discrimination. Can you affirm on that basis? It's on the record. I don't think so, because I think if this had gone the way it was supposed to go, with the prosecutor being required to set forth her reasons, then the defense attorney has something to argue that's a pretext, here's a reason why. She did set forth a reason. But the finding of the trial judge was that you haven't made a prima facie case, not that I haven't found discrimination. And I'd like to read, to go to Judge Rendell's point about the standard, what the court said in Johnson, and this is critical. I meant to say it earlier. We did not intend the first step to be so onerous that a defendant would have to persuade the judge on the basis of all the facts, some of which are impossible for the defendant to know with certainty, that the challenge was more likely than not the product of purposeful discrimination. In other words, you can't hamstring the defense attorney by saying you haven't proven to me discrimination yet when all the facts aren't out there. And because the trial court made a legal error and because the appellate division purported to correct it, but then itself made a legal error, this court now is entitled to, as the appellate division was trying to do, to look at the entirety of jury selection and decide whether the numbers plus the comment later is enough to give rise to an inference. And we respectfully submit that it is. And you agree that the ultimate composition test, which the appellate division used and the district court used here as well, is not the test, is that correct? I agree with that. Not only is it not the test of step one, it shouldn't even be relevant at step three. We said that in an NPO. We said that in Saunders. But what case sets forth that proposition? Well, I think Batson says it because it says discrimination. Is the problem here that this was rated under Gilmore and that the discussions were pursuant to Gilmore, which talks, I believe, about a cross-section, doesn't it? It does. So perhaps people were caught up in the whole cross-section notion without focusing, as they should have, on Batson and its requirements. Right. Eventually it turned into a Batson claim because under New Jersey law, if you raise one, you raise both. And there's been no argument here that there's been a procedural default or that this is an adequate and independent state ground. It would be relevant in a factual pattern where you wait and make your Batson challenge later, not one by one, not so early in the game. You make it later and you say, oh, no, I see there's six blacks on the jury, so I use that to help me say there's no discrimination. I can see why circumstantially you would argue it's relevant, but it's very dangerous because it gives rise to this argument that it's okay if you discriminate against the first two African-Americans or whatever minority group. There's one strike upon a FACI case, one strike of an African-American in this setting. Was that upon a FACI case? No. It was two in this case. Well, with the prosecutor's statement, I would even want to know. What if the juror said, I'm a law and order person, and I always vote with the government, and then the person's stricken? Well, that's the issue, and some of these jurors had people, the first four who were struck had people in law enforcement who, as a former prosecutor, I was in AUSA for 10 years. That's exactly the kind of person I would want on my jury. There's also a school of thought that the person the prosecutor wants least on the jury is a white former police officer. You can argue it either way because she knows he's white. That's right. I see my time is up. I'm going to make one final point regarding the Darden claim because, Judge McKee, you touched on something that I wanted to bring up, and that is I discussed the weakness of the evidence, and you pointed out from going from the mug books to the photo array. He's pathetic. Yeah, he's pathetic. I mean, it's odd that the Supreme Court of New Jersey, which is on the forefront of this issue, has made its Henderson ruling prospective. So the only way Mr. Minor is going to get a fair shake at this and get a new trial under the revamped identification procedures is if he gets relief here. It's concerning that there was an ID of this type, even after the Attorney General guidelines in 2001. This came after the Attorney General guidelines? It came after, but there was a violation of them, and notwithstanding that, his motion for a weight hearing was denied. That wasn't raised, though, was it? It was raised in the district court, and a certificate of privilege was denied on that issue, both in that court and this court. But the concerns about that identification, which I know you are well aware of, and the science on that, is what makes this garden issue so concerning. Mr. Sanders, are you retained counsel in this case? No, we were appointed under this Criminal Justice Act. All right. Well, we thank you very much for your service to the case. Thank you. Thank you very much, counsel. We'll take your case under advisement, and I think that ends the day for us. We'll adjourn to proceed.